LJW/RRH: USAO#2016R00586

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | <u>UNDER SEAL</u> |
| v. | Criminal No. JKB-16-0484 |
| 1.  AARON BOHL,<br>2.  ROZLYN BRATTEN,<br>3.  RACHELLE HANKERSON,<br>4.  DAVID HEARN,<br>5.  XAVIER HOLDEN,<br>6.  JESSE JAMES JONES,<br>7.  THOMAS LEIMBACH,<br>8.  KIMBERLY RAYFIELD,<br>9.  STEPHEN WISE,<br>10. MOHAMMED AKRAM,<br>11. AARON BELL,<br>12. SHAWN BENBOW,<br>13. DAVID BOND, a/k/a "D.J.,"<br>14. JOSEPH BRANCH, a/k/a "Sandtown,"<br>15. ROBERT COSTEN, a/k/a "Bug,"<br>16. MICHAEL COUNTS, a/k/a "Feaster,"<br>17. TRAVIS GIE, a/k/a "T-Guy,"<br>18. JAMAR HUTT,<br>19. SAMUEL JOHNSON,<br>20. TROY JOHNSON,<br>21. DEMARIO KING, a/k/a "Mario,"<br>22. MARK LANCE, a/k/a "Nitti,"<br>23. TERNELL LUCAS, a/k/a "T.L,"<br>    a/k/a "Moon,"<br>24. MICHAEL PAGE, a/k/a "Murder,"<br>25. KEVIN STANLEY, a/k/a "Little Kev,"<br>26. SHAWN SULLIVAN,<br>27. REGGIE FOSQUE,<br>28. CAMMAY GRAY,<br>29. CHASTITY HARMON,<br>30. LEONDRUS HIGGINS,<br>31. DEONYA JOHNSON,<br>32. TERRELL KING,<br>33. MARKAYLA REYNOLDS,<br>    a/k/a "Kayla,"<br>34. CHAVIA SAVAGE,<br>35. RONALD STEWART, a/k/a "Freak,"<br>36. TYEACHA THOMAS COUNTS, | (Racketeering Conspiracy, 18 U.S.C. § 1962(d); Conspiracy to Distribute Possess with Intent to Distribute Drugs, 21 U.S.C. § 846; Deprivation of Rights Under Color of Law, 18 U.S.C. § 242; Aiding and Abetting, 18 U.S.C. § 2; Criminal Forfeiture, 21 U.S.C. § 853) |

| 37. KEVIN THOMPSON, a/k/a "Truck," 38. TRINA WILLIAMS JOHNSON, and 39. ANGEL WHITTINGTON, a/k/a "Nikki," <br><br>Defendants | | |
|---|---|---|

## INDICTMENT

### COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury for the District of Maryland charges that at all times relevant to this Indictment:

### THE ENTERPRISE

1. The Eastern Correctional Institution (ECI) was a Maryland Department of Public Safety and Correctional Services (DPSCS) prison operated since 1987 near Westover, Maryland, in Somerset County, on Maryland's Eastern Shore. More than 3,300 inmates were incarcerated at ECI, making it the largest state prison in Maryland.

2. ECI was a medium-security prison for men built as two identical compounds (East and West) on a 620-acre tract. ECI had a pre-release unit, a minimum security annex for 610 inmates, and an operating capacity of 2,665 medium security inmates. The East and West Compounds were further divided into Housing Units, Housing Units 1 through 4 in the West and 5 through 8 in the East.

3. While inmates were assigned to a specific housing unit, they were able to move among housing units depending on the kind of job they were assigned. For example, each housing unit employed a number of clerks that were able to move among housing units to deliver paperwork and other documents, property custodians, inmates who delivered meals to other inmates who were confined to their cells and others. Certain categories of prison jobs also allowed inmates to access areas that were restricted to the general

2

population, like the Officer's Dining Room, staff bathrooms, storage closets and other

spaces. Further still, certain jobs allowed inmates to be outside of their cells when other

inmates were confined to their cells. Inmates were able to interact with inmates from

other housing units in the prison yard, the infirmary, the education department, in various

recreational activities and in other settings.

4. Maryland law defines, "contraband" as "any item, material, substance, or other thing that:

(1) is not authorized for inmate possession by the managing official; or (2) is brought into

the correctional facility in a manner prohibited by the managing official." MD. CODE

ANN., Crim. L. § 9-410. Further, under Maryland law, a person may not, "(1) deliver any

contraband to a person detained or confined in a place of confinement; (2) possess any

contraband with intent to deliver it to a person detained or confined in a place of

confinement; or (3) knowingly possess contraband in a place of confinement." MD.

CODE ANN., Crim. L. § 9-412.

5. ECI employed 625 correctional officers (COs) and other employees in 2016.

6. COs received annual training in ethics and professionalism. COs were taught that:

> Inappropriate relationships with inmates can include bribery,
> conflicts of interest, solicitation and acceptance of gifts, the
> offering of gifts, favors and services to inmates, ex-inmates,
> relatives of inmates, improper contact or failure to report contact
> with inmates, ex-inmates, relatives or friends and the appearance
> of inappropriate relationships.

7. According to the Correctional Officer's Handbook:

> The illegal possession and/or use of any controlled substance
> and/or controlled paraphernalia while on or off duty is strictly
> prohibited. . . . An employee may not possess or convey
> contraband into an institution or onto institutional property.

8. ECI constituted an "enterprise", as defined in Title 18, United States Code, Section 1961

(4). ECI engaged in, and its activities affected, interstate commerce.

## PURPOSE OF THE ENTERPRISE

9. The primary purpose of ECI ws the safe confinement, supervision and rehabilitation of felons in the State of Maryland.

## PURPOSES OF THE DEFENDANTS

10. The primary purposes of the defendants included:

    a. for correctional officer defendants, using their official positions at ECI to

        i. enrich themselves by trafficking in items prohibited by the prison, i.e. contraband, including narcotics, cell phones and tobacco

        ii. engage in sexual relations with inmates

        iii. subvert the safe and proper administration of the prison by, among other things, preventing inmates from communicating with the prison administration about corruption at ECI and retaliating against inmates that sought to provide information to the prison administration about corruption at ECI

    b. for inmate defendants, to

        i. corrupt COs by offering them money and other things of value including sexual conduct in exchange for the COs

            1. smuggling contraband into ECI

            2. transporting illegal contraband within ECI

            3. monitoring other inmates who were reporting to prison authorities that contraband was being trafficked and ultimately obstructing the efforts of those inmates

        ii. enrich themselves by trafficking in items prohibited by the prison, i.e. contraband, including narcotics, cell phones and tobacco

    c.  for all defendants, violating the legitimate purposes of ECI to further their illegal schemes  and creating a culture of corruption inside the prison that would allow them to continue the racketeering activity and to protect and expand the defendant's criminal operations.

## THE DEFENDANTS

11. Correctional Officers: COs have a duty to further the legitimate purposes of ECI by ensuring that inmates follow the rules enacted for their health and safety and the health and safety of prison employees and the larger community, including, most importantly, the prohibition of criminal activity while incarcerated.  The correctional officer defendants abused their positions of trust as sworn officers of DPSCS by engaging in illegal activities for the purposes of enriching themselves and engaging in sexual relations with inmates.  The correctional officer defendants received bribes in exchange for bringing contraband into ECI including, narcotics, cell phones, pornographic DVDs and tobacco.  COs and employees also engaged in sexual relations with inmates.  This criminal conduct created a culture of corruption and lawlessness and perverted the intended purposes of ECI.  The following defendants were COs assigned to the West Compound at ECI for some or all of the time charged in this Indictment or smuggled contraband to inmates housed in the West Compound for some or all of the time charged in this Indictment:

    **a.** **AARON BOHL** entered on duty with DPSCS on October 19, 2011,

    **b.** **ROZLYN BRATTEN** entered on duty with DPSCS on November 3, 2004,

    **c.** **RACHELLE HANKERSON** entered on duty with DPSCS on October 29, 2011,

    **d.** **DAVID HEARN** entered on duty with DPSCS on July 20, 2010,

    **e.** **XAVIER HOLDEN** entered on duty with DPSCS on October 22, 2012,

    **f.   JESSE JAMES JONES** entered on duty with DPSCS on October 19, 2011,

    **g.   THOMAS LEIMBACH** entered on duty with DPSCS on January 10, 2012,

    **h.   KIMBERLY RAYFIELD** entered on duty with DPSCS on October 23, 2008,

    and

    **i.   STEPHEN WISE** entered on duty with DPSCS on July 20, 2011.

12. Inmates: The inmate defendants solicited COs to smuggle contraband into ECI which the inmate defendants, in turn, sold to other ECI inmates at substantial profit. The inmate defendants used facilitators outside of ECI to bribe the correctional officer defendants, to deliver contraband to them and to manage the illegal proceeds of their contraband trafficking activities inside ECI. The inmate defendants used contraband cell phones to coordinate smuggling and contraband trafficking with COs and individuals outside of ECI who facilitated their contraband trafficking activities. The following defendants were inmates housed at ECI in the West Compound for some or all of the period charged in this Indictment:

    **a.   MOHAMMED AKRAM,**

    **b.   AARON BELL,**

    **c.   SHAWN BENBOW,**

    **d.   DAVID BOND,**

    **e.   JOSEPH BRANCH,**

    **f.   ROBERT COSTEN,**

    **g.   MICHAEL COUNTS,**

    **h.   TRAVIS GIE,**

    **i.   JAMAR HUTT,**

    **j.   SAMUEL JOHNSON,**

  **k.  TROY JOHNSON,**

  **l.  DEMARIO KING,**

  **m.  MARK LANCE,**

  **n.  MICHAEL PAGE,**

  **o.  TERNELL LUCAS,**

  **p.  SHAWN SULLIVAN,**

  **q.  KEVIN STANLEY.**

13. Facilitators:  The outside facilitator defendants participated in unlawful activities in furtherance of the COs and inmates' purposes by procuring and transporting narcotics, cell phones and tobacco to COs and paying bribes to COs to smuggle the contraband items into ECI for distribution by inmates.  The following defendants acted as facilitators of the criminal activities of the COs and inmates:

  **a.  REGGIE FOSQUE,** of Princess Anne, Maryland,

  **b.  CAMMAY GRAY,** of Los Angeles, California,

  **c.  CHASTITY HARMON,** of Princess Anne, Maryland,

  **d.  LEONDRUS HIGGINS,** of Salisbury, Maryland,

  **e.  DEONYA JOHNSON,** of Baltimore, Maryland,

  **f.  TERRELL KING,** of Chestertown, Maryland,

  **g.  MARKAYLA REYNOLDS,** of Salisbury, Maryland,

  **h.  CHAVIA SAVAGE,** of Salisbury and Baltimore, Maryland,

  **i.  RONALD STEWART,** of Baltimore, Maryland,

  **j.  TYEACHA THOMAS COUNTS,** of Columbia, Maryland,

  **k.  KEVIN THOMPSON,** of Baltimore, Maryland,

l.  **TRINA WILLIAMS JOHNSON,** of Baltimore, Maryland and

m.  **ANGEL WHITTINGTON,** of Salisbury, Maryland.

## THE RACKETEERING VIOLATION

14. Beginning at a date unknown to the Grand Jury, but at least by in or about 2013, through

    on or about the date of this Indictment, in the District of Maryland elsewhere, the

    defendants,

**AARON BOHL,**
**ROZLYN BRATTEN,**
**RACHELLE HANKERSON,**
**DAVID HEARN,**
**XAVIER HOLDEN,**
**JESSE JAMES JONES,**
**THOMAS LEIMBACH,**
**KIMBERLY RAYFIELD,**
**STEPHEN WISE,**
**MOHAMMED AKRAM,**
**AARON BELL,**
**SHAWN BENBOW,**
**DAVID BOND, a/k/a "D.J.,"**
**JOSEPH BRANCH, a/k/a "Sandtown,"**
**ROBERT COSTEN, a/k/a "Bug,"**
**MICHAEL COUNTS, a/k/a "Feaster,"**
**TRAVIS GIE, a/k/a "T-Guy,"**
**JAMAR HUTT,**
**SAMUEL JOHNSON,**
**TROY JOHNSON,**
**DEMARIO KING, a/k/a "Mario,"**
**MARK LANCE, a/k/a "Nitti,"**
**TERNELL LUCAS, a/k/a "T.L," a/k/a "Moon,"**
**MICHAEL PAGE, a/k/a "Murder,"**
**KEVIN STANLEY, a/k/a "Little Kev,"**
**SHAWN SULLIVAN,**
**REGGIE FOSQUE,**
**CAMMAY GRAY,**
**CHASTITY HARMON,**
**LEONDRUS HIGGINS,**
**DEONYA JOHNSON,**
**TERRELL KING,**
**MARKAYLA REYNOLDS, a/k/a "Kayla,"**
**CHAVIA SAVAGE,**
**RONALD STEWART, a/k/a "Freak,"**
**TYEACHA THOMAS COUNTS,**
**KEVIN THOMPSON, a/k/a "Truck,"**
**TRINA WILLIAMS JOHNSON, and**
**ANGEL WHITTINGTON, a/k/a "Nikki,"**

9

being persons employed by and associated with ECI, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate and agree to violation Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, consisting of multiple acts under:

    a.  18 U.S.C. § 1343 and 1346 (deprivation of honest services wire fraud) and

    b.  18 U.S.C. § 1956 (money laundering);

and then multiple acts involving:

    c.  Bribery, chargeable under MD. CODE ANN., Crim. L. § 9-201 (Maryland bribery of public employee);

    d.  21 U.S.C. § 846 (conspiracy to distribute a controlled substance); and

    e.  21 U.S.C. § 841 (distribution and possession with intent to distribute a controlled substance).

## MEANS AND METHODS OF THE DEFENDANTS

15. Among the means and methods by which the defendants and others pursued their illegal purposes were the following:

    a.  Defendant COs accepted or agreed to accept payments from facilitators and/or inmates or engaged in sexual relations with inmates as consideration for smuggling contraband into ECI, including narcotics, cell phones and tobacco. The "going rate" for a correctional officer to smuggle contraband into ECI was $500 per package although some COs charged more and some COs charged less.

10

b.  Defendants conspired to traffic in narcotics within ECI, including heroin, cocaine, MDMA, commonly referred to as "molly" or ecstasy, buprenorphine, commonly referred to by the trade name "Suboxone," a prescription opioid used to treat heroin addiction but abused by inmates, marijuana and synthetic cannabinoids (otherwise known as "K2") and other contraband including cell phones and tobacco.

c.  Defendants conspired to smuggle contraband, including narcotics, cellular telephones and tobacco, into the prison, in order to enrich themselves and protect and expand the defendants' criminal operations.

d.  Defendants possessed contraband namely narcotics, cellular telephones, pornographic DVDs and tobacco inside and outside of the prison, with the intent to distribute and sell them in order to protect and expand the defendants' criminal operations.

e.  Inmates acted as both wholesalers and retailers of contraband and in the process made profits that far exceeded the profits that could be made by selling similar drugs on the street.  For example, defendant inmates could purchase Suboxone strips for $3 each and sell them inside ECI for $50 each, or for a profit of more than 1000 percent.

f.  Defendant COs and inmates who were members of gangs sought and received contraband and payment from inmates who were not members of gangs in order to receive protection for their contraband trafficking activities.

g.  Defendant COs and other ECI employees smuggled contraband into ECI. Although required to pass through screening, COs were able to hide contraband on their persons including, for male COs, in their crotch-area and elsewhere on

11

their person, and for female COs in their hair, underwear, in sanitary napkins and internally.  Further, COs took breaks during their shifts and returned to their cars to retrieve contraband.

    h.  Inside the facility, defendant COs delivered contraband to, among other locations,

        i.  inmates in their cells;

        ii.  clerk's offices, which were private offices within each housing unit where an inmate clerk worked, the officer's dining room where officers could interact with inmate servers and kitchen workers; and

        iii.  pre-arranged "stash" locations like staff bathrooms, storage closets, laundry rooms and other places where contraband could be hidden and then later retrieved by inmates.

    i.  Inside the facility, defendant inmates who had jobs that allowed them to move throughout the housing unit and elsewhere in the prison, commonly referred to as "working men," including clerks, "foyer men," "tier reps" and other positions took orders for contraband from inmates, provided orders to corrupt COs and delivered contraband to inmates.

    j.  Defendant COs had sexual relationships with defendant inmates.  Defendant COs exchanged sex for contraband.  In addition, these sexual relationships cemented the smuggling and trafficking relationships between COs and inmates.

    k.  Inmates and facilitators paid COs for smuggled contraband in cash, in Western Union money orders and using PayPal. Inmate defendants were able to use contraband cell phones to pay COs directly using PayPal from within ECI. Inmate defendants also received payments from inmates for contraband through PayPal, often with the assistance of facilitators.

l.  Defendants used cell phones to communicate with one another and coordinate contraband smuggling and trafficking activities.  Defendant COs also used special purpose phones, sometimes called "burner" phones, for contraband smuggling purposes and even shared a "dirty" phone among themselves for contraband smuggling purposes.

m.  Defendant COs warned inmate defendants when the prison administration was planning cell searches so that defendant inmates could hide contraband or pass it to other inmates whose cells were not being searched.  Defendant COs also monitored inmates to determine if they were providing information to the prison administration about contraband smuggling.  When defendant COs learned that inmates were providing information to the prison administration or "snitching" or "telling," defendant COs would try to prevent them from doing so or would alert defendant inmates so that defendant inmates could retaliate against these inmates, sometimes violently.

n.  Defendants used violence to obtain contraband once it was smuggled into the facility, to ensure that contraband that had been paid for by an inmate was delivered to that inmate, and to retaliate against inmates that provided information, or attempted to provide information, to the prison administration about corrupt COs and contraband smuggling or that otherwise interfered with their contraband trafficking activities.

## Overt Acts

16. In furtherance of the conspiracy, the defendants committed the following overt acts in the District of Maryland and elsewhere:

1) On or about September 6, 2013, inmate TROY JOHNSON called WILLIAMS JOHNSON from the ECI jail phone system. TROY JOHNSON told WILLIAMS JOHNSON to order an ounce of K2 online with $600 that he would direct to her.

2) On or about April 7, 2014, inmate TROY JOHNSON called "Bunchy" on the ECI jail phone system. TROY JOHNSON told Bunchy to "load up on them joints" when he checks back into the jail for the year. JOHNSON told Bunchy to get "five or six hundred of them" and to "put them in his butt" when he turns himself in because "niggas will sell their soul for it."

3) On or about April 7, 2014, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system using another inmate's account. The two discussed how WHITTINGTON was supposed to send $1090 to TRINA WILLIAMS JOHNSON. TROY JOHNSON told WHITTINGTON that once she sent the money to WILLIAMS JOHNSON, he was not going to "do it this way anymore." He further told WHITTINGTON, "[t]he only time you are going to hear something from her is when she mail you the mail off," referring to when WILLIAMS JOHNSON, who lived in Baltimore, mailed contraband to WHITTINGTON, who lived on Maryland's Eastern Shore near ECI.

4) On or about March 8, 2014, inmate TROY JOHNSON called TRINA WILLIAMS JOHNSON from the ECI jail phone system using another inmate's account. WILLIAMS JOHNSON confirmed that WHITTINGTON had given her $1090. TROY JOHNSON asked WILLIAMS JOHNSON if she had spoken to a contraband

supplier and she said she was meeting him at "12." WILLIAMS JOHNSON also told

JOHNSON that "Neet" had only given her 39 Suboxone strips. TROY JOHNSON

and WILLIAMS JOHNSON then called Neet using a three-way calling feature and

TROY JOHNSON and WILLIAMS JOHNSON talked with Neet about buying strips

for them. Neet told TROY JOHNSON and WILLIAMS JOHNSON that "crack

heads" sell them at Lexington Market in Baltimore.

5) On or about June 5, 2014, CO BOHL and CO LEIMBACH possessed with intent to

distribute a quantity of a mixture or substance containing a detectable amount of

buprenorphine, also known as Suboxone, a Schedule III controlled substance

6) On or about August 13, 2014, T. KING wired CO HOLDEN a $500 bribe using

Western Union.

7) On or about December 18, 2014, T. KING wired D.W. $600 using Western Union.

8) In or about 2015, CO HOLDEN smuggled K2 into the HU1 clerk in his flashlight.

9) In or about 2015, CO BRATTEN smuggled contraband into Housing Unit 1 for the

Bloods gang.

10) In or about 2015, CO BRATTEN smuggled contraband into Housing Unit 1 to

inmates who identified themselves as Muslims.

11) In or about 2015, inmate SULLIVAN bribed CO WISE to smuggle Suboxone into

ECI.

12) On or about April 21, 2015, TROY JOHNSON called WHITTINGTON on the ECI

jail phone system. TROY JOHNSON told her to text T. KING and tell him that

TROY JOHNSON would be sending something to him and to text WHITTINGTON,

"the information so she can get on top of it."

13) On or about April 29, 2015, TROY JOHNSON called WHITTINGTON on the ECI jail phone system. In the course of their conversation, WHITTINGTON asked JOHNSON if she should give, "everything that I have" to CO BOHL. JOHNSON told WHITTINGTON to give him everything she has and to let him know exactly what it was after she has done it.

14) On or about May 5, 2015, inmate BRANCH texted CO RAYFIELD from his contraband cell phone, "[w]e need some bad. my workers idol," to which CO RAYFIELD responded, "Put [CO] jones 2 work."

15) On or about May 23, 2015, during a telephone call on a contraband cell phone, inmate COUNTS and STEWART discussed how STEWART should package contraband so that it would fit into P.O. Box.

16) On or about May 25, 2015, THOMPSON called inmate GIE on a contraband cell phone and told GIE he had obtained 19 Suboxone strips for him and that he should sell 10 and give the other 9 to another inmate to sell.

17) On or about June 4, 2015, inmate GIE called STEWART from his contraband cell phone and told him to rent the biggest P.O. Box available and to leave one key in it so that CO HEARN could retrieve it.

18) On or about June 5, 2015, during a telephone call on a contraband cell phone, REYNOLDS asked inmate GIE if the money she was managing for him was "illegal money" that he made from selling contraband and GIE told her it was. REYNOLDS responded that he should "do that all the time" since she and SAVAGE received the funds.

19) On or about June 9, 2015, during a telephone call on a contraband cell phone, inmate COUNTS told STEWART to purchase a money order to bribe CO HEARN.

20) On or about June 19, 2015, REYNOLDS mailed a $100 bribe payment in the form of a money order to P.O. Box 512 at the Princess Anne Post Office for CO HEARN.

21) On or about June 21, 2015, inmate GIE texted REYOLNDS from his contraband cell phone that "I may need yall to do me a risky favor but ima give yall some money for it." GIE later told REYNOLDS, "you gonna be picking up some drugs." REYNOLDS responded, "I figured that." Later that same day, REYNOLDS asked GIE about his text and he told her "its not to be said over the phone your phone might be tapped."

22) On or about June 23, 2015, during a telephone call on a contraband cell phone, inmate GIE told SAVAGE that CO HEARN received the money order she sent him in exchange for smuggling contraband into ECI.

23) On or about June 26, 2015, inmate COUNTS, using his contraband cell phone, texted THOMPSON an address for HIGGINS' so that THOMPSON could mail contraband to it.

24) On or about July 3, 2015, inmate GIE called FOSQUE from his contraband cell phone and FOSQUE told him that he had opened a second P.O. Box to use for contraband trafficking, number 517, and that it was big enough to hold a shoe box.

25) On or about July 3, 2015, FOSQUE and inmate GIE possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance

26) On or about July 19, 2015, HIGGINS and FOSQUE possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

27) On or about July 20, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system. JOHNSON and WHITTINGTON discussed how "Big Bro," who had previously smuggled contraband into ECI for them, was at military boot camp and would not be able to communicate with anyone for six weeks. At this time, CO HOLDEN was at boot camp having joined the U.S. Army after resigning from ECI on or about July 16, 2015.

28) On or about July 31, 2015, inmate COUNTS, using his contraband cell phone, and THOMPSON discussed how THOMPSON should package contraband into "6 ounce joints."

29) On or about August 5, 2015, SAVAGE texted inmate GIE and asked him "[w]hy do I have to get this money order?" to which GIE replied, "[c]uz I have to pay the dude for bringing me stuff in." GIE then directed SAVAGE to send a money order to P.O.Box 517 at the Princess Anne Post Office.

30) On or about August 10, 2015, inmate GIE called HIGGINS from his contraband cell phone and told him to open a package that should have 2 pounds of K2 in it; the two discussed how 1 pound of the K2 was for inmate TROY JOHNSON because his "horse" had gone into the Army.

31) On or about August 20, 2015, T. KING wired CO WISE a $500 bribe using Western Union.

32) On or about September 3, 2015, HEARN, FOSQUE, HIGGINS and inmate GIE possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

33) On or about September 9, 2015, during a telephone call on a contraband cell phone, TYEACHA THOMAS COUNTS asked inmate GIE to delete information from the contraband phone that COUNTS had been using. COUNTS had used the phone to try and find information about correctional officers and their families on social media and had been placed in administrative segregation after a letter threatening guards was discovered at ECI.

34) On or about October 7, 2015, T. KING wired C. GRAY $980 using Western Union.

35) On or about October 11, 2015, inmate TROY JOHNSON called WHITTINGTON on the ECI jail phone system using another inmate's account. JOHNSON asked WHITTINGTON if she had contacted CO B.T. today. JOHNSON told WHITTINGTON that he had sent word to B.T. and that B.T. was expecting WHITTINGTON's call.

36) On or about October 18, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system using another inmate's account. JOHNSON told WHITTINGTON that he had a good talk with "Bro." Time and attendance records show that CO B.T. worked in the West Visiting Room on October 18, 2015 on voluntary overtime.

37) On or about October 20, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system using another inmate's account. He told WHITTINGTON that B.T. had arranged for another correctional officer to smuggle contraband into ECI for JOHNSON.

38) On or about October 20, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system using another inmate's account and told her that inmate D.F. was transferred to another housing unit after he had given TROY

JOHNSON money for contraband but before the contraband had been smuggled into ECI. JOHNSON told WHITTINGTON that D.F. sent a message to the Bloods in HU1 to assault TROY JOHNSON because, according to D.F. TROY JOHNSON owed him $8,000. JOHNSON told WHITTINGTON that D.F. had only given him $600 towards a box of K2 and that "Lil Reds," the inmate that D.F. ordered to assault TROY JOHNSON was more loyal to TROY JOHNSON and would assault D.F. instead.

39) On or about October 25, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system and told her to call "Bro" and tell him that WHITTINGTON would have everything including the money ready for him.

40) On or about October 29, 2015, inmate TROY JOHNSON called WHITTINGTON from the ECI jail phone system. He told her, "[y]ou know what Bro is, right? You know what he do and shit, right? . . . I got someone else the same way as him. . . . If somebody call and say his name is C-Murder give him everything ... give him all four bags and the other stuff."

41) On or about November 13, 2015, CO RAYFIELD texted a contraband phone used by inmate BRANCH and told him, "I was gonna try to get some inventory for you."

42) On or about November 14, 2015, inmate BRANCH texted CO RAYFIELD from a contraband cell phone that "I should have 800 tomorrow."

43) On or about November 15, 2015, inmate BRANCH texted CO RAYFIELD from his contraband cell phone, "[s]o how much you make off what you just got" to which CO RAYFIELD replied "800."

44) On or about November 15, 2015, inmate BRANCH, using his contraband cell phone, texted D. KING on his contraband cell phone that, "[w]e might catch again tue. if not

we gotta wait til baby come back from her 5 days ... Would [CO] jones prices be bad

if we payed him half up front and rest when we got it."

45) On or about November 15, 2015, inmate D. KING texted inmate BRANCH, "how

much k we talking about bro?" to which BRANCH responded, "400 strips and 20

ounces!"

46) On or about November 17, 2015, inmate BRANCH texted DEONYA JOHNSON

from his contraband cell phone, "...I just made something happen 4 our other

brothers so they'll be good cause me and bro trying to bust this next trip open.  Did u

find out how much they would charge u 4 20 ounces?  Even 2 pounds," to which she

responded, "I'll do the Division in the Am!"  Later, BRANCH texted DEONYA

JOHNSON, "[y]eah yo we gotta find a way to get the best shit 4 the cheapest price.

Last trip should yield no less than 10,000 between us.  I want the next one to be 25 or

better," to which DEONYA JOHNSON responded, "ok."

47) On or about November 18, 2015, inmates LANCE and CHASE spoke to one another

on their contraband phones and LANCE told CHASE that they can't "tame" CO

WISE so they should "use him up.  Greed."

48) On or about November 21, 2015, inmate BRANCH texted DEONYA JOHNSON

from his contraband cell phone, "[w]hat up sis?  Am i suppose to hook up with u

about the money that bro lending our boy to pay the horse or should I talk to him," to

which DEONYA JOHNSON responded, "[h]ey Brother how are you?  I just came

from seeing Baby!  He didn't say anything but id have some money id NO what I'm

doing it with it though!!"  BRANCH then asked, "Is it 500?"

49) On or about November 21, 2015, D. JOHNSON wired inmate BRANCH $500 via a

text with a 10 digit Pay Pal number.

21

50) On or about November 22, 2015, inmate BRANCH paid CO JONES a $500 bribe via Pay Pal using his contraband phone.

51) On or about November 23, 2015, CO RAYFIELD texted inmate BRANCH on his contraband phone and asked, "[s]hould I bring some inventory."

52) On or about November 23, 2015, inmate BRANCH texted CO RAYFIELD from his contraband cell phone, "I just passed out a pack today. So 1400 is owed to us. U can tell me that I was right about the flip on the k later. Lol. We need more k. Im down to 2 hundred worth. But I got sales 4 tabacco. Some of them movies work, so u can ease them in too. the moreso the freak ones than the regular. U did good job mixing them last time. So its all up to u. I would say tabacco & movies or just tabacco. Then after that k. Cause it'll be dry . . . ." CO RAYFIELD then responded, "[s]o what you think," and BRANCH texted, "It depends on how u feel like travelling. tabacco will move. Its not a flip like the k. But its 300 guaranteed in our pockets. The moves are also at ure discretion. It's a bit extra when we least expect it. Once I move the rest of that k. And sprinkle some tabacco in, everyone of our trips is gonna be no less than 8,000 . . . ." BRANCH then subsequently responded, "I may consider more k if we get done with this and no problems on the cpound."

53) On or about November 24, 2015, CO RAYFIELD texted inmate BRANCH on his contraband phone and asked, "[g]uess I'll have some inventory?"

54) On or about November 26, 2015, inmate BRANCH texted CO RAYFIELD from his contraband cell phone, "I keep telling u that if u do ure part im gonna do mine. I want at least 50,000 leaving this place. I know I can get it. U just gotta remove the leash."

55) On or about November 26, 2015, inmate BRANCH texted CO JONES, "[h]ey whats a good time and day?" CO JONES responded, "Saturday or Sunday before 1 pm."

56) On or about November 26, 2015, inmate BRANCH texted D. KING, "[y]ou say Saturday morning so I'm gonna have everything on deck tomorrow!  May you know what tell him Sunday morning bro.  Here is Kev uncle number XXX-XXX-4281 tell him calling for Kev.  Tell him call Saturday to set up for early Sunday morning!"

57) On or about November 28, 2015, CO JONES and STANLEY possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

58) On or about November 28, 2015, inmate BRANCH texted CO JONES, "Carl probably going to text u from a XXX-XXX-4281 number...."

59) On or about November 30, 2015, inmate BRANCH texted CO RAYFIELD from his contraband cell phone,"[g]otta get rio & my boy their strips.  I just got em 4 em." Later that same day he told her, "What I was saying was I got [CO] jones to get em for them.  I got em now and I have to get em to em."

60) On or about November 30, 2015, D.S. called inmate BRANCH on BRANCH's contraband cell phone and told him that, in response to a request from BRANCH, that he would "check a few places to get different prices" of K2.

61) On or about December 3, 2015, inmate BRANCH texted CO RAYFIELD, "[g]ood job.  Put 2000 in the bank and u take 2000 and put 1 towards credit debt and whatever u need with the other 1000.  Is that ok?  I got our re up still out.  And its a big re up. We bit time on this next trip lol...."

62) On or about December 5, 2015, CO Wise delivered contraband to inmates BENBOW and D. KING's cell.

63) On or about December 19, 2015, inmate D. KING texted inmate BRANCH, "Bro are u saying get my own five ounces, and a$1000," to which BRANCH responded, "[y]eah. A stack to get the 5 in."

64) On or about December 21, 2015, inmate LANCE possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of XLR11, synthetic cannabinoid, also known as K2, a Schedule I controlled substance.

65) From on or about December 21 to on or about December 26, 2015, inmate SULLIVAN possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of XLR11, synthetic cannabinoid, also known as K2, Schedule I controlled substance; FUB-AMB and 5F-AMB, analogues, Schedule I controlled substances, also known as K2.

66) On or about December 25, 2015, inmate BRANCH texted CO JONES from his contraband phone, "XXX-XXX-4281 CARL . IF HE HAVENT ALREADY CALLED U , JUST TEXT EM AND TELL EM WHAT TIME TO COME SUNDAY. URE NAME IS JJ," to which CO JONES responded, "ok."

67) On or about December 28, 2015, inmate BRANCH called STANLEY from his contraband phone and told STANLEY that he was going to give "Ark" some K2 and asked STANLEY if he thought Ark was "goonna blow it."

68) On or about January 4, 2016, at 3:44 p.m., CO WISE sent inmate LUCAS a text on LUCAS' contraband cell phone and told him he would pick up a package of contraband at the Salisbury Post Office.

69) On or about January 4, 2016, at 10:36 p.m., inmate LUCAS sent CO WISE a text from his contraband cell phone and with a PayPal Money Pack number worth $200.

70) On or about January 8, 2016, CO RAYFIELD texted inmate BRANCH on his contraband phone warning him, "[d]on't trust that guy he might be a plant from intel," referring to BRANCH's new cell mate.

71) On or about February 5, 2016, inmate SAMUEL JOHNSON called T. KING from his contraband cell phone and told him he needed to buy 100 Suboxone strips and that he would not pay more than $7 per strip. SAMUEL JOHNSON explained that he can sell the strips for $50 each within ECI and make a profit of $43 per strip.

72) On or about February 7, 2016, T. KING called inmate SAMUEL JOHNSON on his contraband cell phone. T. KING reported that he was not able to buy Suboxone strips from a supplier. SAMUEL JOHNSON told him that he would contact LANCE to see where his facilitators were able to get supplies.

73) On or about February 2, 2016, in a recorded jail call, an unknown male asked inmate AKRAM for money so he can "get this shit out of the way." AKRAM said he's got money coming in the mail from "uptown" and asked the male to cover the rest so he can get "two of the Brandon brothers joints, and um like 9 of the um oranges," which is code for Suboxone, from Missy.

74) On or about February 14, 2016, inmate PAGE texted CO HANKERSSON from SAMUEL JOHNSON's contraband phone "2 donuts," which is code for contraband smuggling.

75) On or about February 14, 2016, inmate PAGE called CO HANKERSON on SAMUEL JOHNSON's contraband phone. In that call, CO HANKERSON expressed concern about too many inmates knowing she would smuggle contraband into ECI in exchange for bribes. CO HANKERSON told PAGE, "[d]on't let it fuck me up. Cuz at the end of the day, I'm gonna to get fucked up ont his shit if shit goes

south between ya'll. . . . But . . . I can't fuck with somebody that's constantly high or constantly drunk! They, you drawing attention to yourself. But you constantly approaching me. . . . And I'm just like the one dude I fool with, I don't you know, deal with him no more. But the one dude I was bringing shit in for, besides the fact he ain't never got his fucking money right. I was, he was just always drunk and out on the tier. . . . Will was like, you shouldn't even brought nothing in if he ain't had brough thismonty together right. If all the money wasn't right, you shouldn't even took it. I'm like, yeah true, you know but you know, it is what it is. . . . "

76) On or about February 17, 2016, inmate SAMUEL JOHNSON called T. KING from his contraband cell phone and told him to "Send 5 ($500) to the Horse [CO WISE] yo."

77) On or about February 20, 2016, inmate PAGE called CO HANKERSON using SAMUEL JOHNSON's contraband phone. CO HANKERSON told PAGE that she might not be able to smuggle in all the contraband he wanted before she left work for vacation. CO HANKERSON told PAGE, ". . . you going to give me 1200 for a pound of K and two cans of tobacco. . . . And for two can well actually for three cans, I usually charge like five. And you want 12 for all of it. That is a lot of cash to be bringing you. . . . " PAGE then asked CO HANKERSON, "[e]verything alright with you and this nigger Troy?" HANKERSON responded that she had contraband to deliver to him, too. PAGE responded, ". . . these niggers already knows what it means to come to me right? I told these niggers, listen whenever I am trying to do something yo. Ya'll have to get on the back burner. See what I am saying and if they say something to you. You let me know. You feel me? They already know what it is. I told them understand, we will house pet that nigger. . . . So these niggers right

here already know what I mean?  I am not trying to tell you what to do.  I am just trying to tell you how the system go on my end. . ."  PAGE then asked CO HANKERSON, "can you just do the pound of K and one joint and one can," and CO HANKERSON agreed.  PAGE then said "12" and CO HANKERSON responded "13" referring to the amount of the bribe CO HANKERSON wanted to smuggle the contraband into ECI, $1200 or $1300.

78) On or about February 21, 2016, inmate SAMUEL JOHNSON called T. KING from his contraband cell phone and told him that he was going to send him a telephone number for a female correctional officer who would smuggle contraband into ECI. SAMUEL JOHNSON told him that the code would be "2 donuts."  SAMUEL JOHNSON told KING that B.B. was going to give KING $1300 to give to the female CO.  SAMUEL JOHNSON also told KING that he wanted KING to give the female CO a pound of K2 and 10 ounces of tobacco.

79) On or about February 22, 2016, inmate SAMUEL JOHNSON called C. GRAY from his contraband phone to tell her that he had been moved to HU7 in the East Compound and to tell T. KING to deliver contraband to a correctional officer that day.

80) On or about April 6, 2016, inmate AARON BELL possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

81) On or about April 14, 2016, inmate AARON BELL possessed with intent to distribute a quantity of a mixture or substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance.

82) On or about April 20, 2016, inmate BENBOW received a shipment of contraband that had been smuggled into ECI.

83) On or about July 21, 2016, inmate BOND stabbed inmate D.S. at CO HANKERSON's direction because HANKERSON, who smuggled contraband for BOND and other members of the Bloods gang, had argued with BOND.

84) On or about July 31, 2016, an inmate stabbed inmate N.M. at CO WISE's direction and in exchange for payment from inmate SULLIVAN, because N.M. had filed a complaint against CO WISE which caused him to be removed from the housing unit. At the time he was removed, CO WISE owed several inmates contraband that he had been bribed to smuggle into ECI.

All in violation of 18 U.S.C. §  1962(d)

## COUNT TWO
### (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics)

The Grand Jury for the State and District of Maryland further charges that:

Beginning at a date unknown to the Grand Jury, but at least by in or about 2013, through on

or about the date of this Indictment, in the District of Maryland elsewhere, the defendants,

**AARON BOHL,**
**ROZLYN BRATTEN,**
**RACHELLE HANKERSON,**
**DAVID HEARN,**
**XAVIER HOLDEN,**
**JESSE JAMES JONES,**
**THOMAS LEIMBACH,**
**KIMBERLY RAYFIELD,**
**STEPHEN WISE,**
**MOHAMMED AKRAM,**
**AARON BELL,**
**SHAWN BENBOW,**
**DAVID BOND, a/k/a "D.J.,"**
**JOSEPH BRANCH, a/k/a "Sandtown,"**
**ROBERT COSTEN, a/k/a "Bug,"**
**MICHAEL COUNTS, a/k/a "Feaster,"**
**TRAVIS GIE, a/k/a "T-Guy,"**
**JAMAR HUTT,**
**SAMUEL JOHNSON,**
**TROY JOHNSON,**
**DEMARIO KING, a/k/a "Mario,"**
**MARK LANCE, a/k/a "Nitti,"**
**TERNELL LUCAS, a/k/a "T.L," a/k/a "Moon,"**
**MICHAEL PAGE, a/k/a "Murder"**
**KEVIN STANLEY, a/k/a "Little Kev,"**
**SHAWN SULLIVAN,**
**REGGIE FOSQUE,**
**CAMMAY GRAY,**
**CHASTITY HARMON,**
**LEONDRUS HIGGINS,**
**DEONYA JOHNSON,**
**TERRELL KING,**
**MARKAYLA REYNOLDS, a/k/a "Kayla,"**
**CHAVIA SAVAGE,**
**RONALD STEWART, a/k/a "Freak,"**
**TYEACHA THOMAS COUNTS,**
**KEVIN THOMPSON, a/k/a "Truck,"**

**TRINA WILLIAMS JOHNSON, and**
**ANGEL WHITTINGTON, a/k/a "Nikki,"**

did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with each

other, and with others known and unknown, to knowingly and willfully distribute and possess

with intent to distribute a quantity of a mixture or substance containing a detectable amount of

buprenorphine, also known as Suboxone, a Schedule III controlled substance; and a quantity of a

mixture or substance containing a detectable amount of cocaine, a Schedule II controlled

substance; and a quantity of a mixture or substance containing a detectable amount of cocaine

base, a Schedule II controlled substance; and a quantity of a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance; and a quantity of a mixture or

substance containing a detectable amount of marijuana, a Schedule I controlled substance; and a

quantity of a mixture or substance containing a detectable amount of synthetic cannabinoid, also

known as K2, also known as XLR11, a Schedule I controlled substance; and a quantity of a

mixture or substance containing a detectable amount of synthetic cannabinoid, also known as

K2, also known as FUB-AMB and 5F-AMB, a Schedule I controlled substance analogue; and a

quantity of a mixture or substance containing a detectable amount of oxycodone, also known as

Percocet and OxyContin, a Schedule II controlled substance; and a quantity of a mixture or

substance containing a detectable amount of alprazolam, also known as Xanax, a Schedule IV

controlled substance; and a quantity of a mixture or substance containing a detectable amount of

tetrahydrocannabinoid, also known as THC, a Schedule II narcotic controlled substance; thereby

violating Sections 841(a)(1) and 846 of Title 21, United States Code.

21 U.S.C. § 846

## COUNT THREE
### (Deprivation of Rights under Color of Law)

The Grand Jury for the State and District of Maryland further charges that:

On or about July 21, 2016, in the State and District of Maryland, the defendants,

**DAVID BOND, a/k/a "DJ," and**
**RACHELLE HANKERSON,**

while acting under color of law willfully deprived inmate D.S. of the right secured and protected

by the Constitution and laws of the United States, to be free from cruel and unusual punishment.

Specifically, defendant **RACHELLE HANKERSON**, a correctional officer at Eastern

Correctional Institution, aided and abetted, counseled, commanded and induced defendant

**DAVID BOND, a/k/a D.J.**, to stab inmate D.S. with a knife resulting in bodily injury to D.S..

18 U.S.C. § 242
18 U.S.C. § 2

## COUNT FOUR
### (Deprivation of Rights under Color of Law)

The Grand Jury for the State and District of Maryland further charges that:

On or about July 31, 2016, in the State and District of Maryland, the defendants,

### SHAWN SULLIVAN, and
### STEVEN WISE,

while acting under color of law willfully deprived inmate N.M. of the right secured and protected

by the Constitution and laws of the United States, to be free from cruel and unusual punishment.

Specifically, the defendants; inmate **SHAWN SULLIVAN**, and **STEVEN WISE**, a correctional

officer at Eastern Correctional Institution, aided and abetted, counseled, commanded and induced

others known and unknown to the grand jury, to stab inmate N.M. with a knife resulting in

bodily injury to N.M.


18 U.S.C. § 242
18 U.S.C. § 2

## FORFEITURE

### RICO Forfeiture

1.    Pursuant to Title 18, United States Code, Section 1963, upon conviction of an

offense in violation of Title 18, United States Code, Section 1962, the defendants

**AARON BOHL,**
**ROZLYN BRATTEN,**
**RACHELLE HANKERSON,**
**DAVID HEARN,**
**XAVIER HOLDEN,**
**JESSE JAMES JONES,**
**THOMAS LEIMBACH,**
**KIMBERLY RAYFIELD,**
**STEPHEN WISE,**
**MOHAMMED AKRAM,**
**AARON BELL,**
**SHAWN BENBOW,**
**DAVID BOND, a/k/a "D.J.,"**
**JOSEPH BRANCH, a/k/a "Sandtown,"**
**ROBERT COSTEN, a/k/a "Bug,"**
**MICHAEL COUNTS, a/k/a "Feaster,"**
**TRAVIS GIE, a/k/a "T-Guy,"**
**JAMAR HUTT,**
**SAMUEL JOHNSON,**
**TROY JOHNSON,**
**DEMARIO KING, a/k/a "Mario,"**
**MARK LANCE, a/k/a "Nitti,"**
**TERNELL LUCAS, a/k/a "T.L," a/k/a "Moon,"**
**MICHAEL PAGE, a/k/a "Murder,"**
**KEVIN STANLEY, a/k/a "Little Kev,"**
**SHAWN SULLIVAN,**
**REGGIE FOSQUE,**
**CAMMAY GRAY,**
**CHASTITY HARMON,**
**LEONDRUS HIGGINS,**
**DEONYA JOHNSON,**
**TERRELL KING,**
**MARKAYLA REYNOLDS, a/k/a "Kayla,"**
**CHAVIA SAVAGE,**
**RONALD STEWART, a/k/a "Freak,"**
**TYEACHA THOMAS COUNTS,**
**KEVIN THOMPSON, a/k/a "Truck,"**
**TRINA WILLIAMS JOHNSON, and**
**ANGEL WHITTINGTON, a/k/a "Nikki,"**

shall forfeit to the United States of America:

    a.     any interest acquired or maintained in violation of section 1962;

    b.     any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

    c.     any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 1962.

    2.     The interests of the defendant subject to forfeiture to the United States pursuant to 18 U.S.C. § 1963(a)(1), (a)(2), and (a)(3), include, but are not limited to a sum of money representing the amount of the gross proceeds received by the defendants derived from racketeering activity as alleged in this Indictment, for which each of the defendants are jointly and severally liable.

<u>Drug Trafficking Forfeiture</u>

    3.     Pursuant to 21 U.S.C. § 853, upon the conviction of an offense in violation of 21 U.S.C. §§ 841 or 846, the defendants,

**AARON BOHL,**
**ROZLYN BRATTEN,**
**RACHELLE HANKERSON,**
**DAVID HEARN,**
**XAVIER HOLDEN,**
**JESSE JAMES JONES,**
**THOMAS LEIMBACH,**
**KIMBERLY RAYFIELD,**
**STEPHEN WISE,**
**MOHAMMED AKRAM,**
**AARON BELL,**
**SHAWN BENBOW,**
**DAVID BOND, a/k/a "D.J.,"**
**JOSEPH BRANCH, a/k/a "Sandtown,"**
**ROBERT COSTEN, a/k/a "Bug,"**
**MICHAEL COUNTS, a/k/a "Feaster,"**

TRAVIS GIE, a/k/a "T-Guy,"
JAMAR HUTT,
SAMUEL JOHNSON,
TROY JOHNSON,
DEMARIO KING, a/k/a "Mario,"
MARK LANCE, a/k/a "Nitti,"
TERNELL LUCAS, a/k/a "T.L," a/k/a "Moon,"
MICHAEL PAGE, a/k/a "Murder,"
KEVIN STANLEY, a/k/a "Little Kev,"
SHAWN SULLIVAN,
REGGIE FOSQUE,
CAMMAY GRAY,
CHASTITY HARMON,
LEONDRUS HIGGINS,
DEONYA JOHNSON,
TERRELL KING,
MARKAYLA REYNOLDS, a/k/a "Kayla,"
CHAVIA SAVAGE,
RONALD STEWART, a/k/a "Freak,"
TYEACHA THOMAS COUNTS,
KEVIN THOMPSON, a/k/a "Truck,"
TRINA WILLIAMS JOHNSON, and
ANGEL WHITTINGTON, a/k/a "Nikki,"

shall forfeit to the United States:

a.      Any property constituting, or derived from, any proceeds obtained directly or indirectly as the result of the offense; and

b.      Any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense.

4.      Such property shall include, but not be limited to, a sum of money equal to the proceeds obtained, directly or indirectly, as the result of the violations of 21 U.S.C. § 846, as charged in Count Two of this Superseding Indictment, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained as a result of the conspiracy to violate the Controlled Substances Act, for which the defendants are jointly and severally liable.

Substitute Assets

5.      If any of the property described above, as a result of any act or omission of the

defendants:

    a.  cannot be located upon the exercise of due diligence;
    b.  has been transferred or sold to, or deposited with, a third party;
    c.  has been placed beyond the jurisdiction of the court;
    d.  has been substantially diminished in value; or
    e.  has been commingled with other property that cannot be divided without
       difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p) and 18 U.S.C. § 1963(m), as incorporated by 28 U.S.C. § 2461(c).


21 U.S.C. § 853
18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

A TRUE BILL:

SIGNATURE REDACTED

_9/29/16_
Date

Foreperson

36